Slip Op. 01-04

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |  |
|---|---|---|---|
| JEWELPAK CORP., | : | | |
| | : | | |
| Plaintiff, | : | | |
| | : | Before: | WALLACH, Judge |
| v. | : | Court No.: | 94-04-00230 |
| | : | | |
| THE UNITED STATES, | : | | |
| | : | | |
| Defendant. | : | | |
| | : | | |

Decided: January 24, 2001

Fitch, King and Caffentzis, (James Caffentzis, Peter J. Fitch), for Plaintiff.

Stuart E. Schiffer, Acting Assistant Attorney General; Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Barbara S. Williams); Chi S. Choy, Of Counsel, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, for Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff, Jewelpak Corporation ("Jewelpak"), is an importer of various "presentation boxes" in which jewelry is shipped, stored, and sold. Plaintiff challenges the U.S. Customs Service's ("Customs") classification of its merchandise. Customs classified the subject merchandise under subheading 4202.92.90 of the Harmonized Tariff Schedule of the United States ("HTSUS"), as "jewelry boxes." This subheading carried a duty rate of 20% ad valorem. Plaintiff contends that some of the boxes should be classified under subheading 3923.10.00, plastic boxes for the conveyance of goods, and the others under subheading 7310.29.00, iron or

1

steel boxes.

A bench trial was held on June 26 and 27, 2000. Pursuant to USCIT R. 52(a), the court enters judgment for Defendant pursuant to the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

1.  This action involves the classification of merchandise. This merchandise was entered at the port of Los Angeles, CA, in July of 1993.

2.  Each piece of subject merchandise has components including: (1) a plastic or metal shell; (2) a hinge; and, in some cases, (3) a textile or plastic sheeting outer covering.

3.  Customs classified the subject merchandise as "jewelry boxes" under HTSUS subheading 4202.92.90 (1993). Imports under this subheading carried a rate of 20% ad valorem.

4.  In relevant part, HTSUS heading 4202, and subheading 4202.92.90 cover

    4202        Trunks, suitcases, vanity cases, attache cases, briefcases,
                school satchels, spectacle cases, binocular cases, camera
                cases, musical instrument cases, gun cases, holsters and
                similar containers; traveling bags, toiletry bags, knapsacks
                and backpacks, handbags, shopping bags, wallets, purses,
                map cases, cigarette cases, tobacco pouches, tool bags,
                sports bags, bottle cases, jewelry boxes, powder cases,
                cutlery cases and similar containers, of leather or of
                composition leather, of sheeting of plastics, of textile
                materials, of vulcanized fiber or of paperboard, or wholly or
                mainly covered with such materials or with paper:
                                        * * *
    4202.92             With outer surface of sheeting of plastic or of textiles
                        material:
                                        * * *
    4202.92.90                  Other. . . . . . . . . . . . . . . . . . . . . . . . .

5.  Plaintiff claims that the subject merchandise is more properly classified under subheading 3923.10.00, plastic boxes for the conveyance of goods, and the others

2

under subheading 7310.29.00, iron or steel boxes. In relevant part, heading 3923, subheading 3923.10.00 and heading 7310, subheading 7310.29.00 cover

| 3923 | Articles for the conveyance or packing of goods, of plastics; stoppers, lids, caps and other closures, of plastics: |
|---|---|
| 3923.10.00 | Boxes, cases, crates and similar articles. |
| 7310 | Tanks, casks, drums, cans, boxes and similar containers, for any material (other than compressed or liquefied gas), of iron or steel, of a capacity not exceeding 300 liters, whether or not lined or heat insulated, but not fitted with mechanical or thermal equipment: |

* * *

Of a capacity of less than 50 liters:

7310.29.00        Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

6. Examination shows the subject merchandise to be flip open boxes consisting of a top and bottom shell which are connected by a steel hinge. The boxes vary in size and shape, depending on the article of jewelry intended to placed within. The bottom shell serves as the base and the top shell serves as the flip open lid. The box shells are composed of either steel or plastic, and may possess an outer covering consisting of textile material or plastic sheeting.

7. The court finds highly probative and credible the expert testimony of Peter C. Fuller, President of Fuller Box Co., which manufactures and markets boxes similar to Jewelpak's model M boxes, see Trial Transcript ("Tr.") at 211-12, that "[t]here is no way to make a quality box that would not be suitable for long-term use", id. at 335.

8. The subject jewelry boxes are designed to protect as well as package jewelry. The jewelry boxes are also capable of being used for storage. Id. at 66, 67 (testimony of James Porterfield).

9. The metal shells of the imported jewelry boxes are generally composed of 15 to 18 gauge steel. Id. at 230 (testimony of Peter C. Fuller that"[I]n a steel box, the minimum gauge used is fifteen, because that's what you need to make a box that

will stand up to repeated usage."); see also id. at 449-50 (testimony of Donald P. Wolfe).

10. The subject jewelry boxes employ hinges composed of more expensive and higher gauge steel, despite a cheaper 12 gauge steel hinge alternative, because the 12 gauge hinges were found to sustain no more than 50 box openings. Id. at 266, 298, (testimony of Peter C. Fuller); see also id. at 423 (testimony of John C. Kilmartin that 12 gauge steel hinges were inadequate); see also id. at 242 (testimony of Peter C. Fuller that "[The customers] would expect that the hinge would remain intact. And, therefore, we have to use a certain type of steel to do that.")

11. The court finds implausible and unpersuasive the testimony of James Porterfield that he had no knowledge about how many times the subject merchandise with an average hinge could be opened or closed, see id. at 91-92, in light of his February 3, 1999 deposition testimony that a typical injection molded box was capable of "a few hundred openings on average or more", and that metal shell boxes are "good for thousands" of openings, see Defendant's Exhibit L at 50, lines 9-19.

12. The fabric covering the Jewelpak model M100N box could be handled "thousands" of times. Tr. at 253 (testimony of Peter C. Fuller). The fabric covering the Jewelpak model F10N box could be handled "indefinitely". Id. at 253-54 (testimony of Peter C. Fuller); see Plaintiff's Collective Exhibit 1-E, items M100N, F10N.

13. A mutual customer of Fuller Box and Jewelpak, Finley Fine Jewelry Corporation ("Finley"), declined to use boxes made with 12 gauge steel hinges, despite acknowledging the cost savings in the shipping and manufacture of such boxes. Tr. at 335 (testimony of Peter C. Fuller).

14. When designing its boxes for Finley, Fuller Box company was concerned not only with "cost reduction", but with making "a product that would stand up to use." Id. at 226 (testimony of Peter C. Fuller).

15. The court finds implausible the testimony of Matthew B. Burris, who oversaw Finley's jewelry box purchases before ultimately leaving the company in 1998,

4

see id. at 114-21, that "[s]ubsequent re-use by a Finley customer was not something [Finley] considered when [Finley] purchased the boxes . . . . ", id. at 163, in light of his subsequent statement that the primary concern that Finley had in ordering boxes was "[q]uality of product, delivered, usable and at the best price," id. at 172.

16. The subject merchandise could be shipped to retail outlets with the retailer's name printed on the merchandise as a form of "free advertising," especially where the merchandise was expected to be reused by the final customer. See id. 188-89 (testimony of Matthew B. Burris), 274, 340 (testimony of Peter C. Fuller); see also id. at 274-75 (testimony of Peter C. Fuller that 90% of Fuller Box customers requested that their name be printed on the jewelry box itself and not on the outer cardboard container, because customers were more likely to retain the jewelry box than the outer container.)

17. Some of the subject jewelry boxes, such as the M100N, H1R, and G10N models, provided for repeated and easy removal and replacement of jewelry, such as rings and necklaces. This was accomplished by simply lifting the tab on the insert and placing the jewelry into the box and then pressing the tab back down. Id. at 251, 257 (testimony of Peter C. Fuller); see also id. at 251 (testimony of Peter C. Fuller that the tabs could be opened "thousands" of times.); see Plaintiff's Collective Exhibit 1-E, items M100N, G10N; Plaintiff's Collective Exhibit 1-A, item H1R.

18. The court finds highly probative and credible the expert testimony of John Kilmartin, President of International Packaging Corporation, which imports and manufactures covered metal and covered plastic boxes similar to the subject merchandise, see Tr. at 367-68, that Jewelpak could not have maintained market competitiveness if its boxes could not withstand long term usage, id. 381-82.

19. The plastic boxes among the subject merchandise, Jewelpak's H series, are designed and constructed with a rigid plastic shell "that will not break easily," and a reinforced hinge that is designed "to stay assembled for a long period of time." Id. at 376 (testimony of John Kilmartin); see Plaintiff's Collective Exhibit 1-A, item H1R.

5

20.     The court finds highly probative and credible the expert testimony of Donald Wolfe, President and Chief Executive Officer of Jewel Case Corporation, a company that produces and markets metal boxes comparable to Jewelpak's model M100N boxes, see Tr. at 443, that the trade expectations for the subject merchandise are "that [the subject merchandise] will get to the place of retail, that it will be used at the place of retail, and be usable later", id. at 456.

21.     If any of these Findings of Fact shall more properly be Conclusions of Law, they shall be deemed to be so.


CONCLUSIONS OF LAW

1.     The court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1581(a) (1994).  Plaintiff timely commenced this action within 180 days of Customs' denial of its protest, and all liquidated duties and charges were timely paid.

2.     The court has previously held in this case that as a matter of law if the boxes are suitable for long-term use that Defendant will prevail.  See Jewelpak Corp. v. United States, No. 00-39, slip op. at 10-11 (CIT April 13, 2000), 97 F. Supp. 2d 1192, 1197 (CIT 2000).

3.     Based on the foregoing Findings of Fact, the court finds the subject merchandise to be suitable for long term use.  The physical construction of the merchandise, the ability of the merchandise to protect as well as store jewelry, the design and marketing of the merchandise, the expectation of both jewelry retailers and the ultimate purchaser that these boxes will survive repeated handling, in addition to other facts revealed at trial, support this conclusion.  Accordingly, Plaintiff has failed to overcome the presumption of correctness (28 U.S.C. § 2639(a) (1994)) that attaches to Custom's classification.

4.     Because the evidence shows that the subject merchandise is suitable for long term use, the court finds that the merchandise is properly classified as "jewelry boxes" under HTSUS heading 4202.  By operation of this finding alone, the subject

6

merchandise cannot be classified under HTSUS heading 3923, or HTSUS heading 7310.

5.     If any of these Conclusions of Law shall more properly be Findings of Fact, they shall be deemed to be so.

_____

Evan J. Wallach, Judge

Dated:          January 24, 2001
                New York, New York